STATE of Missouri ex rel. KANSAS CITY POWER & LIGHT COMPANY, Plaintiff-Appellant,

v.

Ruby CAMPBELL et al., (Exceptions of Ward Taylor, et al., and Exceptions of Kansas City Power & Light Company as to Tract No. 4), Defendants-Respondents.

No. 24808.

Kansas City Court of Appeals.

Missouri.

June 7, 1968.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 7, 1968.

Application to Transfer Denied Nov. 9, 1968.

---

Irvin Fane, Lowell L. Smithson, Stephen E. Brawner, Spencer, Fane, Britt & Browne, Kansas City, for plaintiff-appellant.

John G. Madden, Jr., Donald E. Willson, Madden, Willson & Winger, Kansas City, for defendants-respondents.

CROSS, Judge.

This is a proceeding in eminent domain whereby plaintiff has acquired a strip of land 100 feet wide upon and along the 60 acre tract owned by defendants, Ward Taylor and Eula V. Taylor, as a right-of-way easement for purposes of constructing and maintaining an electric power transmission line. Court appointed commissioners assessed defendants' damages at $5,500.00 and plaintiff and defendants both filed exceptions. Trial in circuit court resulted in a jury verdict and judgment awarding defendants $10,500.00. Plaintiff has appealed.

The Taylor tract is located within the southern urban fringe of Kansas City, about one-half mile south and one-half mile east of Martin City and one mile west of Grandview. Buildings on it included a "very nice home", a tenant house which rented for $80.00–$85.00 per month, a barn and other outbuildings. At the time of the taking the subject tract was used for agricultural purposes. The right-of-way easement runs diagonally across the entire width of the tract and occupies a total of 3.5 acres. Upon and along the easement plaintiff has constructed a 161 KV electric transmission line consisting of two H frame structures, each consisting of two poles approximately 14½ feet apart, braced with cross pieces, upon which have been installed crossarms, wires, conductors and other necessary electric apparatus. Under terms of the easement, the owners retained the right to use the land occupied by the easement, provided such use would not interfere with the transmission lines, but they were not permitted to erect or maintain any permanent structures thereon.

Witnesses on behalf of defendant testified that defendants sustained damages in amounts ranging from $10,100.00 to $30,-000.00. Estimates of defendants' damages as stated by plaintiff's witnesses ranged from $2,700.00 to $3,150.00. According to the evidence the subject and surrounding property is in a stage of transition to residential development use.

Plaintiff's first appeal point charges the trial court with prejudicial error in giving Instruction No. 2, a combined verdict directing and measure of damage instruction reading as follows:

"You must award Defendants Ward Taylor and Eula V. Taylor such sum as you believe was the difference between the fair market value of Defendants' whole property immediately before the taking on the 29th day of May, 1964 and the value of Defendants' remaining property immediately after such taking, which difference in value is the direct result of the taking and of the uses which "Plaintiff has the right to make of the property taken.

MAI 9.02 (Modified)

Offered by Defendants"

Instruction No. 2 has been adapted from the appropriate Missouri Approved Instruction, to-wit: MAI 9.02, "Damages—Eminent Domain—Part of Property Taken." The pattern form was followed to the letter except for the identification of defendants by their individual names.

Plaintiff's first challenge of Instruction No. 2 is in substance a contention that it should have employed the word "rights" instead of the word "property" in referring to the easement as the property interest appropriated. Plaintiff theorizes that the instruction as given "compelled the jury to consider that the property within the subject easement strip was gone or in essence taken in fee" and "in effect directed the jury to ignore that any market value was left in the subject easement strip after the taking." This theory is founded on the MAI Committee's Comment in Notes on Use following form 26.05 to which further reference will appear.

■ The entire MAI formulary referable to eminent domain consists of three patterned instructions. 9.01 is the prescribed form for use "where defendants total property is taken", as the committee so notes. Obviously 9.01 is inappropriate in this case. 26.05 is a form to be used "where the condemning authority offers evidence that the property owner sustained no damage from the taking." In the Notes on Use of 26.05 the committee has directed that the word "rights" be used instead of the word "property" where "easements etc. are taken rather than the fee." Significantly, however, as the committee also directs, 26.05 is a verdict directing instruction to be used in condemnation cases "where the condemning authority offers evidence that the property owner sustained no damage from the taking." The proceeding presently before us is not such a case, inasmuch as it is affirmatively established by plaintiff's own evidence, and by each of its witnesses

on value, that defendants sustained damage in substantial sums. Hence 26.05 and the Notes on Use are not applicable to the submission in this case. It is the committee's positive direction that MAI 9.02 "shall be used where only part of defendant's property is taken." Inasmuch as the taking in this case is of such nature, and it affirmatively appears from all the evidence that defendants were damaged, 9.02 was properly selected as the prototype of Instruction No. 2, whereby a verdict in favor of defendants is directed and the measure of their damage is defined. And, since the committee's comment on the use of 9.02 contains no reference to 26.05 except that it must be given "where the condemning authority offers evidence that the property owner sustained no damage from the taking," we reject the suggestion that under the circumstances of this case the terminology of 9.02 should have been modified to accord with that employed in 26.05.

■ Recent opinions have made it "crystal clear" that in order to accomplish the purpose for which MAI forms were prepared, "the courts must insist that they be utilized," Brown v. St. Louis Public Service Co., Mo.Sup., 421 S.W.2d 255; Motsinger v. Queen City Casket Co., Mo. Sup., 408 S.W.2d 857; Gousetis v. Bange, Mo.Sup., 425 S.W.2d 91. As pointed out by Judge Finch, speaking for the Supreme Court in Brown v. St. Louis Public Service Company, supra: "This court, by its adoption of Missouri Approved Instructions, promulgated precise approved instructions. * * * The special committee carefully considered the precise words to use in each approved instruction in order to provide simple, concise and understandable instructions. Directions as to the format to be followed were given to cover those instances where no MAI instruction is provided or where the facts of a case require modification of an MAI instruction. When an MAI instruction is applicable, its use is mandatory. * * * If this court is to make this system work, and preserve its integrity and very existence, we must insist

that mandatory directions be followed and that the pattern instructions be used as written. Otherwise, as we quoted the special committee's report in our opinions in Motsinger v. Queen City Casket Co., Mo., 408 S.W.2d 857, 860, and Hunter v. Norton, Mo., 412 S.W.2d 163, 166: '" * * * If counsel are permitted to 'improve' the approved instructions, even within the confines of specific precedents, the value of these instructions will be lost. Each such 'improvement' by one counsel will prompt an offsetting 'improvement' by his opponent and after a while the court will not be able to find the original with a divining rod." ' "

MAI 9.02 has been written and promulgated as the approved instruction form by which to submit the issue of damages in condemnation cases such as this where only a part of defendants' property is taken. It is phrased in terminology consistent with the constitutional mandate "That private property shall not be taken or damaged for public use without just compensation." V.A.M.S., Constitution, Art. 1, Section 26. It is a clear and accurate statement of the jury's duty as it has long been recognized by the courts and delineated in pre-MAI instructions. See State ex rel. State Highway Commission v. Kendrick, Mo.Sup., 383 S.W.2d 740 and cases cited; 11A Mo.Digest, Eminent Domain, ☞136 and 137. The trial court would have been in error had it not followed mandatory directions and used pattern Instruction 9.02 as it was written. As our final comment on the matter we observe that there was abundant evidence to inform the jury that the easement strip was not taken from them in fee and that some residual use value therein survived the appropriation. These facts were apparent from specific language of the easement which was read to the jury.

■ Plaintiff next contends Instruction No. 2 is erroneous in that it directed the jury to find "some undescribed and vague type of value (of plaintiff's remaining property) *after the taking*. Reference

to the text of the instruction reveals that it uses the words "fair market value" to guide the jury in evaluating *the whole property before the taking*, but uses only the unmodified word "value" when referring to *the remaining property after the taking*. It appears to be plaintiff's contention that the entire phrase "fair market value" should have been repeated in the latter instance. We find the charge of error to be without substance. In the first place, the instruction faithfully follows MAI 9.02. Furthermore, as we are reminded by the Supreme Court in Brown v. St. Louis Public Service Co., supra, we are to assume that "the special committee carefully considered the precise words to use in each approved instruction in order to provide simple, concise and understandable instructions." Under that assumption it is our opinion that the Committee, having once utilized the phrase "fair market value" in reference to defendant's property before the taking, felt that in ensuing references the word "value" would connote the same intendment. We believe the jury would have so understood.

■ One more charge of error is made against Instruction No. 2—that it was improper to insert therein the names "Ward Taylor and Eula V. Taylor" following the word "defendants" where it first appears. Plaintiff urges us to believe this was done "so as to focus the jury's attention upon the fact that defendants were individuals while plaintiff was a corporation." There is no merit to this complaint. It is expressly permissible to designate parties by their individual names in MAI instructions. See Committee Comments on page XXXIV of MAI. Furthermore, as the caption indicates, this is a *multi-party action*. Reference to the petition discloses the names of fifteen defendants. In our opinion the use of the parties' names serves a practical and utilitarian purpose—to identify the instruction with the particular proceeding in which it was used.

Plaintiff's point two charges the trial court with error in giving Instruction No. 3 here quoted:

"The term 'fair market value' means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and is bought by one willing and desirous to purchase it but who is not compelled to do so.

"In determining fair market value, you should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future.

MAI–15.01

Offered by Defendants"

Instruction No. 3 is identical to MAI form 15.01 (with the exception of one word later to be discussed) and is specifically required to be given when MAI 9.02 is used. The first of two alleged grounds of error argued by plaintiff is that the instruction was "time-disoriented", in that it did not correctly inform the jury that their consideration of the "best uses" of the property should be "under conditions to be reasonably expected in the near future" *as viewed from the date of taking,*—but instead lead them to believe that the "near future" referred to was an interval of time *from and after the trial date*. It is plaintiff's specific suggestion that the second paragraph of Instruction No. 3 should have read, "In determining fair market value you should take into consideration all the uses to which the property could best be applied or for which it could be best adapted under conditions existing on the date of taking (on May 29, 1964) and under conditions to be reasonably expected in the near future viewed from the date of taking (on May 29, 1964)." It is sufficient to say that the trial court did not err in using MAI form 15.01 without the modification plaintiff suggests at this late hour. It is implicit in the instruction that "the near future" of which it speaks is a period of time beginning *immediately after the taking* which occurred on May 29, 1964, as the jury were informed by Instruction No. 2. We believe that Instruction No. 3 correctly states the law, afforded the jury a sufficient understanding of the issues for their determination, and is not inconsistent with Instruction No. 2 as plaintiff has suggested. See Union Electric Company v. Sturmfels, Mo.Sup., 401 S.W.2d 480 and State ex rel. State Highway Commission v. Koberna, Mo.Sup., 396 S.W.2d 654. If the plaintiff deemed the instruction to be incomplete or insufficiently hypothesized, or felt that any further hypothesization was necessary, it should have offered a clarifying or amplifying instruction. Failing to do so, plaintiff will not now be heard to complain. Kaiser Aluminum & Chemical Sales, Inc. v. Lingle Refrigerator Co., Mo.App., 350 S.W.2d 128, and cases there cited.

Plaintiff also complains of Instruction No. 3 that it improperly modified MAI 15.01. The "modification" consists of the substitution of one word—i. e., the conjunction "and" for the conjunction "or" where it appears between the word "willing" and the word "desirous" in the first paragraph. To make the matter clear we quote the first paragraph of Instruction No. 3, and, for comparison, the first paragraph of MAI 15.01 as follows:

Instruction No. 3:

"The term 'fair market value' means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and is bought by one willing *and* desirous to purchase it but who is not compelled to do so."

MAI 15.01:

"The term 'fair market value' means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and is bought by one willing *or* desirous to pur-

chase it but who is not compelled to do so."

Defendants inform us that the substitution of "and" for "or" was inadvertent and unintentional. Plaintiff charges that defendants' counsel have intentionally modified Instruction 3 to rephrase the test of fair market value in a light "improperly and argumentatively favoring the respondents." Our analysis of the given instruction, under the evidence and in the light of standard dictionary definitions of "willing" and "desirous", does not lead us to that conclusion. We believe the average juror would attribute essentially the same meaning to the phrase "willing and desirous" as he would to the phrase "willing or desirous" when used to describe the hypothetical "purchaser" with which we are concerned. Although the instruction was technically imperfect, we are not willing to say that it was prejudicially erroneous. In Johnson v. West, Mo.Sup., 416 S.W.2d 162, the Supreme Court ruled that omission of the word "either" and substitution of the word "on" for "in" did not make a verdict directing instruction (MAI) prejudicially erroneous. In reaching that conclusion the court quoted the following from Wegener v. St. Louis County Transit Co., Mo.Sup., 357 S.W.2d 943, 949: "'* * * While Instruction No. A may not have been "technically perfect" in that it contained a patent typographical error and a word obviously misspelled, it was substantially correct in form and substance and for this Court to justify its refusal for such slight and inconsequential deviations would be to set the standard above that required in the practical administration of justice.'" Such is the situation now before us.

Plaintiff next complains that the trial court prejudicially erred by excluding and striking from the record certain evidence offered at the hearing on plaintiff's motion for new trial for the purpose of showing that juror Thurston, one of nine jurors who signed the verdict, was biased and prejudiced against plaintiff, and that consequently plaintiff was deprived of the right to a trial by twelve fair, impartial and unbiased jurors. In essence, plaintiff charges that Thurston, on voir dire examination, had improperly concealed the fact that he had previously owned residential property in Leawood (a subdivision frequently mentioned in evidence) in the vicinity of an electric power transmission line such as was involved in this case; that the easement was a matter of concern or aggravation to him, and that he sold the property, in large measure, for those reasons—but that plaintiff's offer to establish by the testimony of Thurston and two fellow jurors that Thurston had made statements to that effect during jury deliberations was improperly denied by the trial court.

At the outset of voir dire examination it was explained to the panel by the court that an electric transmission line had been constructed on defendants' property, the line was described as consisting of two H-frame (two pole) structures with accompanying appurtenances, and plaintiff's counsel inquired whether any panel member had *never* seen such a structure. The panel responded by silence. The court specifically inquired of a panel member whether he had ever had any property involved with construction of a power line. Then plaintiff's counsel asked the question, "Is there any member of the jury panel who has ever lived in a residence or apartment built adjacent or near to any of these easement strips?" Again the panel members (including Thurston) were silent. Individual examination of panel member Thurston was of a general nature and referred principally to previous places of residence, his family and his employment. The court questioned panel members individually as to previous lawsuits or claims made by them or any members of their families. Juror Thurston revealed that there were "several" automobile accidents involving his family, "settled" to their satisfaction; that he was party to a suit involving title to a used automobile in 1948 and to another suit involving a piece of equipment he had purchased, and that both cases terminated to his satisfaction. Thur-

ston stated that none of those "experiences" would influence him in any way and that he could render a fair and impartial verdict. Appellant's counsel asked additional questions addressed to the entire panel as follows: "MR. SMITHSON: Now, we have asked a lot of questions, here, and perhaps some of you may have thought of something that you wanted to say in response to some question that either side of us, here, asked. Is there anybody who wanted to add to or subtract from anything he said here so far? All right. Now, is there any member of the jury panel who may have some reason that we haven't even touched on that may, in some way, cause you to feel that you should not sit as a juror in this case, just something that you think of on your own? All right. I take it by your silence that you do not."

Plaintiff's timely filed motion for new trial contained allegations that plaintiff was deprived of the right to a trial by twelve fair, impartial and unbiased jurors because, according to information received from Mrs. Blanche C. Aziere, one of the twelve jurors, a certain juror who signed the verdict (whose name Mrs. Aziere had refused to divulge), although asked questions on voir dire calling for disclosure of certain information bearing on his qualifications, nevertheless improperly failed to disclose such information, to-wit: that he (the then unknown juror) had owned residential property in Leawood, or in the greater Kansas City area, in the vicinity of a transmission easement such as the one involved in the case; that he disliked or was aggravated by the transmission line and that he sold his residential property for those reasons; that (according to Mrs. Aziere) he argued such matters to the jury; and, that such information was not obtained from Mrs. Aziere until several days after the jury was discharged.

At the hearing on the motion for new trial plaintiff adduced testimony to identify that the juror referred to by Mrs. Aziere was juror Thurston. From land records it was established that Thurston and his spouse owned residential property in Leawood, purchased February 11, 1945; that an electric transmission line easement was granted to the Kansas City Power & Light Co. (plaintiff) over and along such property on May 25, 1946, by the Thurstons' predecessor in ownership in the exercise of restrictions subject to which the property was purchased. It was not shown that a transmission line of the kind involved in this case was ever constructed upon it. It was further shown that from the Thurston property in Leawood, and at a distance of approximately a quarter of a mile, three H-frame structures of a transmission line which plaintiff had constructed and was operating through Leawood were visible. After owning the Leawood property for about two and a half years the Thurstons sold it on September 18, 1947. There is no evidence that they had occupied it as a residence.

Plaintiff called juror Thurston as a witness and examined him in reference to alleged statement made by him in the jury room. Thurston testified as follows:

"Q. Now, I'll ask you, sir, please, if you will just state to the Court whether or not in the jury room you stated that you had owned residential property in Leawood near one of these transmission easements, that the easement was a matter of concern or aggravation to you, and for that reason, large measure, you sold this property.

"A. I believe I did."

The court sustained defendants' objection to the question interposed on the ground that it was hearsay and called for testimony of the juror for the purpose of impeaching the verdict. Thereupon, plaintiff made formal offer of proof of the matters contained in the above quoted question. The court denied the offer and additionally, pursuant to motion by defendants' counsel, struck from the record Thurston's answer to the question. Plaintiff also called as witnesses two additional jurors, namely,

Anita Margaret Dunn, the foreman, who did not sign the verdict, and Blanche Aziere. Plaintiff undertook to show by each of them, both by speaking interrogation and formal offer of proof, that juror Thurston, in the jury room, and in the jurors' presence had stated that he had owned residential property in Leawood near to a transmission line such as was involved in this case; that he was aggravated by reason of it and the location of his property in its vicinity; and that he sold the property because he did not like or was aggravated by the line. Additionally plaintiff offered to show by juror Dunn that Thurston had repeated such statement in her presence after the jury was discharged. These offers were also refused by the court.

▆▆▆ Plaintiff's claim that bias and prejudice existed in the mind of juror Thurston during jury deliberations is founded on the premise that at the time the voir dire examination was conducted he knew certain facts bearing on his capability to serve as an impartial juror, but that he intentionally failed to divulge them when questions were asked calling for their disclosure. Even assuming that the testimony of the three jurors was properly admissible and that during jury deliberations Thurston truthfully stated that he had owned residence property in Leawood in the vicinity of a transmission line easement, that he disliked it and was aggravated by it, and mainly for those reasons sold it, it does not necessarily follow that the trial court was bound to believe that Thurston was mindful of those facts when interrogated on voir dire at the start of the trial three days prior to the beginning of jury deliberations. No direct question was asked of him relative to the subject. As for the general question whether any panel member "has ever lived in a residence or apartment built adjacent or near to any of these easement strips", it would have been within the trial court's province of discretion to conclude that Thurston's lack of response thereto was not

an intentional or fatally improper concealment of the facts in question. This, for several reasons: (1) There is no evidence that Thurston actually "lived in" his Leawood property. (2) Considering that the property was a quarter of a mile distant from the transmission line, it is reasonably debatable whether it could be considered as "adjacent or near to" the named facility. (3) An interval of more than nineteen years had elapsed between Thurston's ownership and sale of the Leawood property and the voir dire examination. During the examination no question was asked or reference made to Leawood reasonably tending to stimulate the juror's memory of his "experience" with the Leawood transmission line. (4) During the trial considerable evidence, including pictures, was introduced involving properties in Leawood. Conflicting opinions expressed by witnesses gave rise to controversy as to the effect of the Leawood line on nearby property values. Repeated reference to all these matters could reasonably account for Thurston's better recall of his Leawood property ownership and matters incident thereto thereafter while deliberating the verdict. It is well established that primarily, and subject to review, the determination of whether a prospective juror has been guilty of an intentional concealment must be left to the sound discretion of the trial court. Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795. Under that rule the trial court could have concluded, without error, that the proferred testimony of the jurors, without more, was insufficient to show that Thurston was guilty of intentional concealment as charged and to establish plaintiff's entitlement to a new trial.

▆▆▆ However, there is more fundamental reason for this court not to disturb the trial court's action on the motion for new trial. We are deterred from that course by the traditional rule that the jury's privacy shall not be invaded. "The rule to which there is no exception in this

state is that a juror will not be heard to impeach the verdict whether the alleged misconduct occurred inside or outside the jury room." Carlisle v. Tilghmon, Mo. Sup., 174 S.W.2d 798 (citing Steffen v. Southwestern Bell Telephone Co., 331 Mo. 574, 56 S.W.2d 47, Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795 and other cases). The foregoing quoted rule is the basis of Supreme Court decisions, here noted, clearly holding that affidavits or testimony of jurors will not be heard as to statements of a juror to show that the juror had concealed material facts from which the court could infer that the juror was not qualified by reason of bias and prejudice.

In Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795, the trial judge granted a new trial because of the bias and prejudice of a juror and his concealment on voir dire of the fact that there had been certain litigation against himself bearing on that question. The court's action was based on the testimony of a deputy clerk who overheard statements made by the juror in the jury room. In the course of the hearing on the motion for new trial the juror had been subjected to extensive cross-examination by counsel, and to some extent by the court, as to what had transpired in the jury room. This was a matter of complaint on appeal, disposed of by the court as follows: "Appellant's final contention is that neither the court nor counsel had the right to make the searching inquiry of the juror as to what transpired in the jury room, and that the order granting a new trial should, therefore, be set aside. The court did make an extensive examination of the juror but little of the examination was directed to happenings inside the jury room. *The court made some examination, and permitted plaintiff's counsel to make some examination of the juror as to matters happening in the jury room. This was improper.* However, we are of the opinion, and so hold, that the improper examination of the juror by court and counsel did not

destroy the power of the court within the reasonable exercise of its discretion to grant a new trial for the reasons assigned." (Our italics.)

In State v. Finnell, Mo.Sup., 280 S.W.2d 110, it was alleged in the motion for new trial "that defendant was deprived of his constitutional right of trial by a fair and impartial jury by reason of the bias and prejudice of juror Logan Prather, which was unknown to defendant or his counsel until after verdict." On voir dire examination the juror gave answers to the effect that he could render a fair and impartial verdict. In support of the motion the defendant submitted an affidavit of the juror to the effect that when questioned he had formed an opinion, that it would take evidence to change that opinion and that he didn't know why he was accepted as a juror. Defendant also submitted the affidavit of a third person stating the juror had disclosed those facts to the affiant. Declining to consider the affidavits in ruling the motion, the court stated: "Upon the basis of Prather's answers to the questions propounded to him upon voir dire examination he was qualified to sit as a juror in the case. Section 546.150 RSMo 1949, V.A.M.S.; State v. Garrett, 285 Mo. 279, 226 S.W. 4, 7; State v. Stanton, Mo.Sup., 68 S.W.2d 811, 813. The law is clear and well settled that neither affidavit constituted competent evidence to impeach the verdict. In the case of State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38, 45(14, 15), we said: 'As was pointed out in the Reich case (Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 492, 129 A.L.R. 795) a "juror will not be heard to impeach" his and the jury's verdict, either as to conduct inside or outside the jury room, either before or after their discharge. State v. Bailey, 344 Mo. 322, 126 S.W.2d 224; State v. Keller, Mo.Sup., 104 S.W.2d 247. It necessarily follows that "affidavits or testimony of third persons as to statements of jurors tending to impeach their verdict are inadmissible, not only as hearsay but also for the same reason

which excludes the affidavits or testimony of the jurors themselves." ' "

In the recent case of Smugala v. Campana, Mo.Sup., 404 S.W.2d 713, the plaintiff on appeal complained that the trial court erred in refusing to grant him a new trial for the reason one of the jurors (Ralph H. Schroeder) was biased and prejudiced against him because of having heard plaintiff's neighbor state "that plaintiff had a violent temper and took it out on his kids," and that he was thereby denied the deliberation of twelve impartial jurors. In support of his motion for new trial plaintiff submitted the affidavit of Mrs. Swofford, another juror, stating, "After the trial was over I heard Ralph H. Schroeder * * * state that he had been told by a neighbor of Mr. Smugala's that Mr. Smugala had a violent temper and was rough on his wife and kids." Mrs. Swofford also was permitted to testify, over defendant's objection that her testimony would be hearsay and because a juror will not be heard to impeach his verdict. She testified that she heard juror Schroeder make the quoted statement after the jury had returned its verdict. The court ruled as follows: "The well-founded and long-established rule, based on sound public policy, is that the affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury. Woehler v. City of St. Louis, 342 Mo. 237, 114 S.W.2d 985, 987(4) and cases there cited; Cook v. Kansas City, 358 Mo. 296, 214 S.W.2d 430, 433–434(9–11). And it matters not whether the juror from whom the impeaching evidence may come concurred in or dissented from the verdict. Davis v. Kansas City Public Service Co., Mo., 233 S.W.2d 669, 676(6) and cases there cited. The court erred in admitting this evidence, but plaintiff may not have the benefit of error favoring him and for which he was the sponsor. Although heard by the trial court, we may not for the reasons above stated, consider this evidence in ruling this assignment. Woehler v. City of St. Louis, supra. We hold that the court did not err in failing to grant plaintiff a new trial on the grounds stated in this assignment of error."

Also see Baumle v. Smith, Mo.Sup., 420 S.W.2d 341, where the plaintiff and his attorney filed a joint affidavit in support of plaintiff's motion for new trial, stating that on the day the verdict was returned the foreman of the jury stated to them and in their presence, "I used to work as a truck driver,—I wouldn't have brought back a verdict against the truck driver if he had a thousand feet to stop in." No other evidence was submitted and the trial court denied the motion for new trial. On appeal the Supreme Court held: "The affidavit will be considered in the light most favorable to the prevailing party, who is entitled to all reasonable inferences which may be fairly drawn therefrom in his favor. 66 C.J.S. New Trial § 198 a. So considered, we are of the opinion that the statements made by the juror inhere in the verdict, and therefore fall within a forbidden field of inquiry. * * * On this record we cannot hold the trial court guilty of an abuse of discretion in denying the motion for new trial based on misconduct of the juror Ousley."

Plaintiff cites and relies upon: Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993, where a juror was tried for contempt of court by reason of concealment and misstatement in voir dire examination (a proceeding entirely unrelated to any question of verdict impeachment since there was a hung jury in the original action); State v. Kociolek, 20 N.J. 92, 118 A.2d 812, 58 A.L.R.2d 545, a New Jersey case, decided on a different rule of law than is followed in this state; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, holding that a juror's affidavit was admissible to show misconduct of the bailiff as an *extraneous* influence; Bass v. Durand, 345 Mo. 870, 136 S.W.2d 988, where a juror improperly failed to disclose on voir dire examination that he had sued a physician for malpractice upon

his son and such information was disclosed during the trial *by the physician* after he had testified as a witness for the defendant; Dalton v. Kansas City Transit, Inc., Mo.Sup., 392 S.W.2d 225, where a juror admitted at the hearing on the motion for a new trial that he had intentionally concealed prior claims for damages for personal injuries, but gave no testimony as to any communication to the jury; State v. Hermann, Mo.Sup., 283 S.W.2d 617, where a conviction was reviewed because a prospective juror remained silent when the panel was asked on voir dire examination if they had ever been accused of a criminal offense, although it later "conclusively" appeared that he was not a qualified juror by reason of a prior felony conviction (apparently by record, there being no reference in the opinion to oral testimony heard on motion for new trial); State v. Malone, 333 Mo. 594, 62 S.W.2d 909, where affidavits of jurors were filed *by the state in opposition to the motion for new trial,* attempting to establish that jury misconduct shown by the testimony of third persons had not been prejudicial to defendant; Jones on Evidence, Section 811, page 1522, and Wigmore on Evidence, Vol. 8, Section 2345, page 677—references of general and inconclusive nature. None of the foregoing has significant bearing on the question now considered.

Although it is not cited, we are cognizant of the recent decision in City of Flat River v. Edgar, Mo.App., 412 S.W.2d 537. The St. Louis Court of Appeals there ruled that the reception and consideration of testimony by the jury foreman, establishing that two members of the jury did not participate in the jury's deliberations, did not violate the rule that juror evidence cannot be admitted to impeach the verdict. By reason of the particular facts involved, Flat River is readily distinguishable from this case and other cases which have followed the rule. On voir dire examination the two jurors mentioned had remained silent when asked the "usual" question whether any one of the panel knew of any reason why he could not render a fair

and impartial verdict, thereby (as the reviewing court held) representing that they would participate in the process leading to a verdict. After verdict and judgment the defendant filed a motion for new trial alleging that because the two jurors were members of a religious sect "constitutionally" opposed to jury service, whose leaders had advised them not to serve on a jury, they had refused to take any part in the consideration and rendition of a verdict, thereby depriving defendant of his right to have his case tried by a jury of *twelve* impartial, qualified jurors. At the hearing on the motion it was shown by the jury foreman's testimony that the two jurors refused to take part in jury discussion, deliberation, or balloting, and expressly surrendered to the other members their function of arriving at a decision. The reason assigned for this conduct was that the church of which they were members didn't want them "to take any part in this". A new trial was granted and the appellate court affirmed. In its opinion the court acknowledged the rule that testimony of a juror may not be received to contradict or destroy a verdict, as it had previously held in Sadlon v. Richardson, Mo.App., 382 S.W.2d 9, where the court had stated that the rule is limited to "matters inherent in the verdict." Distinguishing the situation at hand from an attack on the verdict as such, the court said, "Here, however, we are dealing with a matter more fundamental even than a verdict; we have had presented to us the inescapable question of the capacity, the legal competence, of a group of persons to render a lawful verdict.", clearly indicating that the juror's evidence went to extraneous matter *entirely unrelated to the verdict,* except as it served to show that the case was decided by the deliberations of only *ten* persons, and that the parties were thereby deprived of their constitutional rights to have a jury of *twelve* participating members. Ruling the evidence in question admissible for that purpose, the court concluded that "* * * the admission of the testimony of the jury fore-

man did not violate the rule that juror evidence cannot be admitted to impeach the jury verdict."

■ Adhering to the rule followed by the Supreme Court in deciding Reich v. Thompson, State v. Finnell, Smugala v. Compana and Baumle v. Smith (all supra), we conclude that plaintiff has not clearly established that the trial court erred in denying plaintiff's offers of proof by jurors Thurston, Dunn and Aziere.

■ Plaintiff's point four charges the trial court with prejudicial error in permitting respondents' counsel to inflame the jury by stressing the "Poor Man Versus Rich Man" and "Individual Versus Corporation" themes. This complaint arises from two incidents. In point of time, the first incident occurred during voir dire examination of venireman Lyle N. Nunn. Responding to general interrogation by plaintiff's counsel, Mr. Nunn stated that his employer has a sizeable holding in the "Power and Light" stock. Upon individual interrogation by defendants' counsel it developed that Mr. Nunn was and had been employed for ten years by the Linda Hall Library Trust as an accountant-auditor. Additional questions asked, answers given, objections made by plaintiff's counsel, and action by the court were as here quoted: "MR. WILSON: (Defendants' counsel) And in that relationship, you are very familiar with the estate's holdings in the Kansas City Power & Light Company? MR. NUNN: Yes, sir. MR. WILSON: And the income produced and realized from those holdings? MR. SMITHSON: (Plaintiff's counsel) Objected to as immaterial to this case, Your Honor. Move it be stricken and the panel be instructed to disregard such a thing. THE COURT: Overruled." Thereafter, plaintiff's counsel moved for discharge of the panel for the reason stated that the voir dire examination of Mr. Nunn concerning his knowledge of the income from his employer's holdings in the Kansas City Power & Light Company

improperly focused the attention of the jury "on that subject and with respect to that feature," that it had no bearing on the issues of the case, and that it was not a legitimate subject for voir dire inquiry. The trial court overruled the motion and venireman Nunn remained on the panel of eighteen, but did not survive the "striking" phase, as one of the twelve jurors.

Plaintiff now argues that the quoted examination of Mr. Nunn was "a deliberate and obvious attempt to play up the supposed corporate wealth and corporate nature of the appellant" and that the trial court by overruling objection thereto in effect authorized the jury panel to consider "such immaterial and prejudicial matters." As supporting authority plaintiff relies upon Green v. Ralston Purina Company, Mo., 376 S.W.2d 119, where the Supreme Court reversed a judgment in favor of an individual plaintiff against a corporate defendant because of obviously improper and inflammatory argument to the jury by plaintiff's counsel, which included the following quoted remarks, "'* * * This is a place where men and corporations must have their arguments decided. * * * This represents a struggle of a little man against one of the biggest corporations in the business. * * * Any corporation that can reach out and bring witnesses from Germany, Jefferson City or anywhere else can b(u)y their soul.—'" The cited case has no bearing on the present question. The voir dire examination of venireman Nunn, in contrast with the flagrantly improper argument of counsel in Green, supra, was within legitimate bounds. It was conducted by defendants' counsel in the exercise of his legal prerogative to search the the mind and conscience of each prospective juror to discover any bias or prejudice or other condition of mind that might influence his deliberations. Without such information, defendants could not have intelligently challenged panel members for cause or knowingly exercised their privilege of striking from the jury list. The trial court wisely and properly used its

discretion in permitting the examination of venireman Nunn as it was conducted, and committed no error by refusing to discharge the jury.

The second episode of the trial pointed to by plaintiff as an effort on the part of defendants' counsel to inflame the jury occurred while defendant Ward Taylor was testifying as a witness. Involved are the following quoted questions and answers, objections by plaintiff's counsel, and ruling of the court:

"Q. (by defendants' counsel) * * * Now, I am going to ask you if you would please tell the Court and jury when you first acquired this property—how long have you lived there, by the way?

"A. I have been there approximately twenty-five years.

"Q. And would you tell the Court and jury how you acquired this property?

"A. We moved to this property in late 1942, I believe it was. We rented this property for a number of years. I worked—we farmed the property. Also, I worked in another job. We worked, I think it was, about twelve, thirteen years to acquire enough money, savings, to buy this property.

"Q. What is your occupation, Mr. Taylor?

"A. I do some farming, and I'm a carpenter.

"Q. And you were a carpenter in 1942?

"A. Yes sir.

"Q. From whom did you acquire the property?

"A. Mr. W. T. Grant.

"Q. And when was this? A. We bought the property in October of 1955.

"Q. Did you have—were you renting from Mr. Grant in 1942?

"A. Yes, sir. We rented—

"Q. And your testimony is that it took you how long to accumulate enough money to buy it?

"MR. SMITHSON: Objected to as repetitious. I think it is immaterial, Your Honor.

"THE COURT: Overruled

"A. About twelve, thirteen years.

"Q. (By Mr. Madden) Twelve or thirteen years?

"A. Yes."

It is clear to us that the testimony above quoted was not elicited to inflame or prejudice the jury and we believe that it had no such effect. For that matter, it is apparent that even plaintiff's counsel had no misgivings on that score at the time of trial because the testimony was objected to *solely* on the ground that it was repetitious and immaterial. The claim of error now asserted has not been preserved and is ruled adversely to plaintiff, both for that reason and because it has no merit in substance.

Plaintiff next contends that the verdict of $10,500.00 is excessive and asks for a new trial or, in the alternative, substantial remittitur. To support its position plaintiff points to the circumstance that the commissioners awarded the lesser sum of $5,500.00, argues that the jury verdict is not supported by adequate evidence because defendants' expert witnesses did not sufficiently support their opinions by testimony of contemporary and comparative sales, generally re-argues matters in evidence favorable to its own position properly addressable only to the jury, and, undertakes to demonstrate excessiveness of the award in this case by comparison with lesser awards in other cases, to-wit: State ex rel. N. W. Electric Power Co-Operative, Inc. v. Waggoner, Mo.App., 320 S.W.2d 84; United States v. 86.52 Acres of Land, D.C., 250 F.Supp. 619; and Stortenbecker

v. Iowa Power & Light Company, 250 Iowa 1073, 96 N.W.2d 468.[1]

Nothing presented under the foregoing suggestions affords any justification for us to disturb the award. As noted by Judge Stone in Empire Dist. Electric Co. v. Johnston, 241 Mo.App. 759, 268 S.W.2d 78: "Although 'the appellate courts may, in a proper case, interfere where the damages in condemnation are grossly excessive or inadequate', City of St. Louis v. Buselaki, 336 Mo. 693, 80 S.W.2d 853, 857(9), it has been held repeatedly that an award of damages supported by substantial evidence will not be disturbed. City of St. Louis v. Schopp, 325 Mo. 480, 30 S.W.2d 733, 734(1); Prairie Pipe Line Co. v. Shipp, supra, 305 Mo. 63, 267 S.W. 647 loc. cit. 650(4), and cases there cited. A judgment in a condemnation proceeding should not be disturbed 'because of a disparity in the testimony of witnesses or even because of a seeming preponderance of the evidence one way or another', City of St. Louis v. Gerhart Realty Co., 328 Mo. 103, 40 S.W.2d 661, 665(12); and it has been held specifically that the opinion of one qualified witness as to the extent of damage 'would constitute substantial evidence'. City of St. Louis v. Buselaki, supra, 80 S.W.2d loc. cit. 857(7)." Also see Missouri Public Service Co. v. Hunt, Mo.App., 274 S.W.2d 27 and cases digested in 11A Mo. Digest, Eminent Domain, ☞262(4).

There is an abundance of evidence to sustain the verdict in this case. Defendant-owner Ward Taylor testified that the highest and best use of the property would be for residential development, and that the decrease in value per acre was $300.00 totalling $18,000.00. Three additional witnesses produced by defendants testified on the issue of damages after establishing their qualifications to do so by reason of their experience in the real estate field. Mr. C. E. Edelbrock, a "developer" whose business was the buying and development of land into residential subdivisions, building thereon, and reselling, testified that the highest and best use of the Taylor property was for residential development, and that the depreciation in its total value resulting from the easement impressed was between $20,000.00 and $25,000.00. Carl Bolte, Jr., an officer of the Paul Hamilton Company, and real estate appraiser with ten years experience, testified that the property was in transition to urban use and that its ultimate utility was residential. In his opinion the easement taking diminished the property's value by $10,100.00. George R. Raupp, a licensed real estate broker with seventeen years experience in appraising and selling development property and other real estate, also testified that the property was in transition between farmland and urban use—ultimately residential. He placed the total devaluation of defendants' property at $30,000.00.

The qualifications of Messrs. Edelbrock, Bolte and Raupp to testify as expert witnesses on the land values involved were established in conformity with standards laid down by Missouri courts[2] and to the satisfaction of the trial court. The admission of their testimony is not shown to have been an abuse of the discretion which is vested in the trial court

1. cf. Southwestern Bell Telephone Co. v. Jennemann, Mo.App., 407 S.W.2d 85, where the condemnor contended that a jury award of $4,000.00 for an underground telephone line easement across 3/10 of an acre on a 20 acre tract was excessive. Ruling otherwise, the court said: "While we may in a proper case interfere where the damages in condemnation are grossly excessive; however, where the award of damages is supported by substantial evidence, it will not be disturbed."

2. See State ex rel. State Highway Commission v. Bloomfield Tractor Sales, Inc., et al., Mo.App., 381 S.W.2d 20 for an exhaustive discussion by Judge Ruark of the qualifications necessary to testify as an expert witness on the value of real estate; also see State ex rel. State Highway Commission v. Barron, Mo.Sup., 400 S.W.2d 33.

to determine preliminarily the qualifications of an expert witness, and the court's action in that respect is consequently not subject to disturbance by this court. State ex rel. State Highway Commission v. Bloomfield Tractor Sales, Inc., et al., Mo. App., 381 S.W.2d 20. In this connection it is to be noted that although plaintiff's witnesses testified to materially lower values of the subject property than did defendants' witnesses, "Such disparity is not a sound reason for an appellate court to disturb the verdict in a condemnation case." Missouri Public Service Company v. Hunt, Mo.App., 274 S.W.2d 27. And, as the court said in Empire Dist. Electric Co. v. Johnston, 241 Mo.App. 759, 268 S.W.2d 78, " 'The weight to be given defendants' evidence is severely assailed by plaintiff in its brief, but it is not within our province to judge the weight to be given the testimony of a qualified witness.' State ex rel. Kansas City Power & Light Co. v. Gauld, Mo.App., 222 S.W.2d 940, 945·(13)."

The amount of the commissioners' award has no relevance to the question presently considered, where, as in this case, the verdict of the jury is supported by substantial competent evidence. Nor is the question properly to be determined by comparison of the verdict with those rendered in other cases. "In determining fair market value each case must be considered in the light of its own facts, not on the basis of some artificial rule, but of sound judgment and discretion on a consideration of all relevant circumstances." City of St. Louis v. Union Quarry & Construction Co., Mo.Sup., 394 S.W.2d 300. Considered on that basis, the verdict of the jury which we have found to be supported by competent evidence and reached under proper instructions, will not be interfered with by this court.

In a separate and final point plaintiff insists that "The verdict was so excessive as to show bias and prejudice on the part of the jury." In support of this contention plaintiff incorporates by reference its general argument made under the preceding point and reargues certain points of alleged error that we have previously held to be without merit. We rule the point adversely to plaintiff's contention.

The judgment is affirmed.

All concur.